A minor. All rise. Illinois Court Board of Commissioners now in session. Honorable Justice David Parra-Lavarro is presiding. Good morning everybody. Have a seat. Do you want to call the case? Case 1-251395. In regarding Z.A. a minor. Good morning everybody.  It's nice to see a full house here. So, in this case, each side will be given 15 minutes to argue their side of the case. The appellate has 5 minutes to argue and rebuttal, if they so choose. You don't have to reserve that time. You'll be given that. These mics actually work pretty well today. But they work primarily to record and not to amplify. So just keep that in mind. And if you can introduce yourself when you step up, that's also helpful. Yeah, keep your voice up as loud as possible so they can hear you in the back row. There you go. All right. Whenever you're ready, proceed. Thank you. Good morning, Your Honors. Good morning. Assistant Cook County Public Defender Frank Adams on behalf of Respondent Appellant T.A. As a preliminary matter, Your Honor, we would like to address this court's order of May 8, 2026, which indicates that the party shall be prepared to discuss the recent appellate decision in N. Ray T.J. Citation 2026, Ilef v. 242406, and the implications on the current case. I recognize that none of the parties in the briefs cited to N. Ray T.J., so as a preliminary housekeeping matter, we would like to make an oral motion to cite to this N. Ray T.J. as additional authority. Proceed. It was part of the court's order, so yes. Okay.  Also, as a housekeeping matter, I would like to indicate that as an officer of the court, I called the State Supreme Court's clerk's office about N. Ray T.J. because at the time that this court's order was issued, N. Ray T.J. was facing a petition to leave to appeal to the State Supreme Court, that on May 28, as was represented to me by the State Supreme Court's clerk's office, the petition to leave to appeal was denied, and there was an order by the State Supreme Court to direct the appellate court on July 2nd to enter the mandate. So my understanding is that N. Ray T.J. is currently part of the body of law in Illinois. Okay, that's our understanding also. Okay, thank you. Okay, so Your Honors, as background, this is an appeal from findings and rulings of adjudication and disposition on June 23rd, 2025. The adjudication rulings were of lack of necessary care and injurious environment under the Juvenile Court Act. That's the posture of this case. This appeal is from those two June 23rd, 2025 orders. What we are asking for, before I get to argument, is for a reversal of the adjudication order and for a vacating of the disposition order, and our primary argument, as I will get to in a moment, is that N. Ray T.J. is dispositive of this appeal, and supports our argument that there should be a new adjudication hearing and a vacating of the disposition. But, of course, if the court is so inclined, it also has the discretion to dismiss the petition for adjudication of wardship. And as a tertiary request, we are asking, which the public guardian is also asking as an alternative, we understand from the briefs, as their secondary argument for this court, again, this is our tertiary request, for the court to pursue to its powers under Supreme Court Rule 366, to enter a finding of no-fault liability. But that's only if this court does not side with the argument that I'm getting ready to make that N. Ray T.J. is similar enough to this case to apply as precedent and reverse the adjudication ruling and have a new adjudication hearing. Okay, and I'm sorry. Counsel, I know there's been a lot of buildup to the argument, and I don't want to keep you from it, but just so I'm clear as to the relief that you're seeking, you'd first just seek a straight-out reversal of the adjudication and vacate the dispositional order. That's correct. Or if we're filing T.J.'s, N. Ray T.J.'s holding, we've remanded for a new hearing. That's correct. Okay. Thank you. I'm sorry if I wasn't clear about that.  We did that. That would make you happy. It might make my boss take me out for lunch. And, yes, thank you, Your Honor. It would make me happy. It would make my client happy. Is your client present today, by the way? No, Your Honors. No. Okay. So getting to the argument. So, as Your Honors are aware, as I indicated, this is an appeal from adjudication rulings, and the adjudication ruling in this case was based on the state's theory and allegations in the petition for adjudication of medical neglect. And the allegations in the petition in our case was that the minor has a heart condition that requires a certain medication, and the allegations were that the mother was not ensuring that the proper administration of the medication for this particularized heart condition. Now, in our case, this is the first point I'm going to make about how this case is similar to T.J. Oh, I'm sorry, back to T.J. So T.J., Inmate T.J., as the Court is aware, which was issued on March 25, 2026, there was a reversal of adjudication finding and ruling of injurious environment in a case alleging medical neglect. And the allegation in Inmate T.J. was that a minor with epilepsy and sickle cell anemia was not being administered the proper medication by the parent. And in a one-day adjudication hearing, the trial court in Inmate T.J. found that, sided with the state that there was medical neglect and that the parent was not correctly ensuring proper medication. Now, Inmate T.J., like our case now, this is a point where it might be the only agreement with the state. So the state in its first footnote in its response brief indicates that all that's relevant in this case is the evidence that was presented at the adjudication, nothing else. Because our argument is that the adjudication ruling was against the manifest weight of the evidence, which I believe this Court also agrees is the standard of review in this case. So in Inmate T.J., in our case, let me say, in our case, the only evidence that was presented were two child protection investigator, the testimony of two child protection investigators and a voluminous exhibit of medical records of the entirety of the minor's medical history at the University of Illinois at Chicago. Over 4,000, by our calculation, the size of the exhibit was 4,023 pages. In Inmate T.J., the, excuse me, the evidence in that case was that the state presented two child protection case workers and a voluminous over 4,000-page medical record of the minor's history and a witness that was qualified as a child abuse pediatric expert. So there was an expert witness in that case, but ultimately Inmate T.J. decided that it was the wrong expert. And there was a reversal of the adjudication ruling in Inmate T.J. because this Court in Inmate T.J. determined that the state, the trial court was incorrect in determining that the state had met its burden because the medical records themselves were not interpreted and explained by an expert and also because the state did not, well, as part of that, the state did not satisfy its burden of proving medical neglect for several reasons, one of which is that there was no expert to testify about the ramifications of what particularized treatment was necessary for the minor and also the ramifications of non-treatment. Does the judge need an expert to tell the court the minor has a condition that requires medicine and the minor isn't getting that medicine? That would seem to be a pretty straightforward situation. Your Honor, I love law school questions, okay, because I believe the correct answer based on T.J. is that not in every case, but in T.J., yes, and in our case, yes, because it's very similar. So in T.J., the Court did indicate that, and I'm going to quote, expert testimony is not always required in medical neglect cases. Well, let's talk about our, let's talk about, I understand in T.J. it wasn't required, but let's talk about why it then is necessary in our case. Okay. You're right. Okay. In our case, because the size of the medical document that was admitted without objection in our adjudication, and also the nature of the alleged medical condition in our case was, well, it was of a heart condition. So it would appear, as in T.J., the alleged condition, epilepsy, and the treatment for it, according to the court in T.J., required the right expert. So someone in neurology is what the court in T.J. recommended might have been the correct expert. In our case, the allegation is that the minor suffered from having an artificial heart valve from the surgery, and the risk that was alleged was blood clotting. And there were, the allegation also was that the parent was not, that my client was not ensuring that the minor was administered the correct medication and went to certain medical appointments. But the caseworker testified, at least one of the caseworkers testified to talking to the doctor, one of the doctors, right? Yes, that the mother was late for pickup of a particular medication. However, however... The claimant also testifies that she talked to both of the doctors, and she testifies as to what they told her about the child's condition and whether or not how the prescriptions worked and whether she was getting it filled on time. Okay, but you're not, with all due respect, Justice Kish? Kish. I'm sorry, okay. So I believe what you just indicated might have been in the medical records and might have been in testimony from caseworkers in hearings other than the adjudication that are not relevant to the court's inquiry today. But what you're indicating, I believe, is the reason that an expert was required or would have helped. Was there any objection in that regard in the trial court? No, there was no objection to the admission of the medical records. But let me read from Inmate TJ. In Inmate TJ, the court said that the state in this case was required to prove that a particular medication was necessary to effectively treat the minor's epilepsy and that the minor would suffer adverse health consequences such as brain damage or death. Okay, in our case, it would seem the same should have been required of the state, that it was required to prove that a particular medication was necessary to effectively treat the minor's heart condition and any adverse consequences from non-treatment. And there was no testimony by experts of this. Information might have been in the medical reports, but among the concerns that Inmate TJ noted was that without detailing where in the medical records, so even assuming Your Honor is correct, that the citation to the relevant parts of the medical records did not occur and even curse the relief service until closing arguments at the adjudication. So this is a case where in the state and the public guardian's response briefs, there were particularized citations to parts of the medical records which might contain that information, but my reading or my understanding of Inmate TJ is that the court was really chiding the trial court on how it conducted the hearing and in particular how it considered the medical records without assistance. And please let me read. So as a result of these types of cases, I'm going to quote from TJ. Without any assistance from trial testimony, lawyers for the state and the GAL were left to rifle through the medical records, of which there were over 400 pages in TJ, as in our case, in search of evidence after the fact to justify the trial court's neglect findings. With the record in this condition, both Mother and this court were left to wait until the states and the GALs in italics response briefs on appeal to learn what evidence supported the trial court's ruling. And that is exactly what happened in this case. So I do concede that the state and the public guardian, they have at least two pages in their statement of facts where they detail the particular pages in the medical records that were admitted at the adjudication that support the medical neglect theory. But it wasn't until appeal, the appeal, that those particularized pages were indicated or relied on by the state and the public guardian. But those records are, those 4,000 pages of records were admitted, as he said, without objection and were before the court, right? Yes, Your Honor. In a hearing that took part of the day. So this was the first time that apparently that the court had to consider the records without the assistance of expert testimony, which it would appear to me, in a case such as this, the expert might be a cardiologist or someone with some expertise in hematology. Why do you need an expert for the scenario to support? Mr. Sandoval Garcia testified that we saw the medications at the house. She didn't have enough medication during the time frame in which she was supposed to be taking them. I'm sorry, I'm not sure. She said there was still, in September, there was still medication left over. His conclusion is that she wasn't taking it properly. Do you need a medical expert to testify to that? Well, in my opinion, Your Honor, in this case, yes, you do. And here's why. Because, you're correct, Mr. Sandoval Garcia was one of the state's witnesses, but he testified that he visited the home on January 14, 2025, and that he was okay. He felt that everything was okay because the medication, that is the blood thinner medication that he observed that was picked up in September, that the supply was not exhausted. Okay, yes, his testimony was that he observed at least a month's worth of supply left. However, there was testimony about when the mother picked up previously in September, but there was no evidence about how much, or the quantity, that is, of that particular medication that was picked up, and only that the doctors prescribed four to six months at a time. That's my reading, once again, from the medical records. But it was clear from his testimony that the medication was not exhausted. However, my understanding, and when you get to the state and the public guardian, is that they disagree with our calculation of how much was picked up and how much was available, and based on their calculation of however many, the quantity, that is, of the doses that was picked up, whether that was evidence or not of a minor adequately taking that part, that particular medication. And I believe my argument, based on Inmate PJ, is to clear up any discrepancy between one side's representation of how much of a particular medication is required per dosage, how much is required for pickup, how much was actually picked up at the time. So in my opinion, there is a discrepancy in the evidence about, because as I guess... ...expert opinion testimony about what would be safe for the minor in terms of dosage... But the testimony was that she was prescribed two injections per day and that she didn't have enough medication, according to Mr. Sandoval-Garcia, for that time period in which she had filled the prescription. He knew there was some left, yes, I believe what you're saying. There was testimony that there was medication left, but she filled it in September. Okay, Your Honor, I agree in part and disagree in part. I agree that Mr. Sandoval-Garcia testified that the supply had not been exhausted, but I disagree with Your Honor's testimony that, or Your Honor's assertion that Mr. Sandoval-Garcia was the person who testified that she required two self-injections a day. I really believe that that evidence, it comes from two sources, either the medical records themselves, which would arguably require expert testimony to decipher, and from previous hearings. So let's say the TC tells Roman, tells caseworker Roman. Caseworker Roman, my understanding of the value of her testimony, is that my client refused in-tact service. She had a telephone conversation with my client close to the time of the visit. Screaming and caseworker Roman not cooperating in October. That's correct. Which, in my opinion, has nothing to do with whether an expert was required to fulfill the state's burden. And in fact, when the caseworker's trying to determine, is your client cooperating to make sure that the minor's getting the medically necessary, the treatment necessary for her medical condition, and she's your client screaming and not cooperating, can't the judge consider that? Yes, Your Honor, but in my opinion, Your Honor just skipped a step. So you said that the caseworker's role is correctly to determine whether the minor is getting a correct administration of the correct medicine. But moderating a TJ is that you need an expert to interpret the medical records to determine exactly what the correct treatment is, exactly what the correct medication is, and also the ramifications of noncompliance. Because the state and the public body point to evidence in the medical records of the minor missing medical appointments for a certain treatment. But the minor, in this case, never had to have a medical appointment. So the state's supposed to wait until some medical emergency happens or if there's a heart failure before they can question this or bring these kind of cases? Okay, my understanding, Your Honor, of inmate TJ is it started out by saying that it's sad that the case was handled this way because it wasn't commenting on how colorable the medical neglect claim was. That it's more about, and this is my argument, it's more about the way that the adjudication hearing was handled. I mean, what's in the best interest of the trial should always govern any child protection proceeding. But to ensure for this case and future cases that the child, in a claim that the child was not receiving the proper medication, it should be, in terms of evidence to the court, which is all the court has to consider, what the correct medication and dosage is, what the correct treatment, what the right tool is for the problem, and the ramifications. So there was really no, as I stated, expert testimony necessary. And I don't think that either Mr. Sandoval Garcia or Ms. Volnick testified about the ramifications of the minor not receiving treatment. That was all in the over 4,000 pages of the medical document, which were not accompanied by expert testimony. I'm sorry, Your Honor. I don't want to interrupt you. Okay. So then, counsel, given the medical records that do have, at some point, the fact that these are medically necessary medicines, and given Roman and the two caseworkers, Sandoval Garcia and Roman's testimony, then can we really say that the opposite result is clearly apparent? Given the standard of view, can we say that? If you follow TJ, yes. Because, again, what the state was required to prove, that a particular medication was necessary, that the minor would suffer adverse health consequences if she did not receive the correct medication. Even if, reading the over 4,000 pages, it could be discerned some sense of that, but to do it all in one day, which this hearing, the adjudication and the disposition in this case both occurred on June 23, 2025. There was really not enough time, which that's one of the parts of TJ, I believe, is that an expert witness is necessary to get it right. So to get the correct answer of what kind of medication and the ramifications of non-treatment. And, of course, what's in the best interest of the child, that's always paramount, but to make sure that the right answer of the best medical treatment for the child, to decipher from over 4,000 pages of medical records what the correct tool is for her treatment. You need an expert, as in this case, and as I said, I believe the correct expert would have been a cardiologist or someone knowledgeable in hematology. Counsel, we're kind of pushed past your time. Oh, I'm sorry, I thought there was a light that was supposed to come on. It makes a loud noise and it's kind of rude. Sorry, just keep an eye on the clock when I do it. It's very clicky. But I just want to, did you have anything else you wanted to add? Based on TJ, we're asking for a reversal of the adjudication. And, again, even though TJ also, one quick point, TJ was a reversal of a finding of injurious environment. In our case, we have findings of injurious environment and lack of necessary care. We're asking for a reversal of them both because they both relied on the same evidence, which included the voluminous medical records, the testimony of the two child protection investigators, and there was no expert witness helping the court and the parties discern the proper treatment for the minor based on the medical records. So we're asking for a reversal of the adjudication, vacating of the disposition, a new adjudication hearing, and in the alternative, a dismissal of the petition and as a tertiary position of finding of no-fault responsibility. No-fault dependency, excuse me. So thank you. Good morning, and may, I'm sorry, may I? You may proceed. Good morning, and may it please the court. I am Assistant State's Attorney Marina Parra on behalf of the people, and we are here asking this court to affirm the neglect findings in this case as they were supported by the evidence. For clarity, the people will be splitting our argument time with our fellow appellees, the public guardian's office. So I will do my best to keep my eye on the clock and keep it to about seven or ten minutes, if the court's permission. Okay. Thank you. The adjudication findings entered in this case were strongly supported by the evidence presented at trial and should be affirmed. Importantly, it should be noted at the outset that only one finding of either abuse or neglect is required to affirm the adjudication finding. The minor in this case was found neglected in two ways. The first, that she was denied necessary medical care, and the second, that she was exposed to an environment injurious to her welfare. But both of those are based on medical care, right? Yes. Okay. Yes. Where is the evidence presented that she actually missed doses of her daily blood thinner medication, as opposed to just maybe didn't get a refill or maybe didn't get a Walgreens and that kind of thing? The medical records, as counsel indicated, are not only voluminous, they cover her entire life. But if one looks at the medical records just from the time the petition was filed in late January, back about six or seven months, which the people believe is a fair time frame to look at in this matter, one will see notations from pharmacists and her pediatric cardiologist that they had concerns that had been expressed about the timeliness of respondent mothers' actions refilling the prescriptions. Are the med records divided up so that we can say, like, this is her, this is when she was an infant, and here is her childhood records, and here is her teenage records? They're in reverse chronological order, Your Honor. And so only about 250 pages of those 4,600 pages or so covered that time frame from when the adjudication petition was filed in late January back to, say, early May. It's about 252 pages, I think was my math. And was that drawn to the, was that brought to the court's attention, like, Judge, look, you've got 4,000 pages that we're bringing in, have been allowed in without objection, but really you just need to focus on these 252? I do not believe that particular point was made clear to the trial court. With respect to the neglect care necessary findings, there are three significant facts which are not in dispute with respect to those findings, and those facts in and of themselves establish the neglect of Z.A. Number one, that she has a life-threatening heart condition, specifically rheumatic heart disease, for which she received the Mitchell valve replacement. Number two, that as noted, she required twice daily blood thinner medication and penicillin injections every 28 days. And number three, that respondent mother has been very open in acknowledging that she did not monitor her child's receipt of her twice daily blood thinner medications. So, counsel, I guess this is where your opponent would say, the life-threatening heart condition that required a Mitchell valve replacement, what do we know? Wouldn't that require some greater knowledge of medical, would require some medical testimony, more than just a record that says Mitchell valve replacement? I can, based on your representation and based on kind of just, we can foot track it. It's a heart condition, so the Mitchell valve is somewhere in the heart, and that was what was replaced, but what that is and what that did and why the medicine is necessary, wouldn't the court have benefited by hearing some testimony about that? Well, your Honor raises an excellent point, naturally, and more evidence is always a good thing. Expert testimony, especially in a medical case, is always beneficial. However, the reason that medical expert testimony was not required in this case, and what distinguishes it from TJ in a very significant manner, is that there was no dispute in this case, unlike TJ, as to the medical necessity of the medication or the nature of the minor's illness. In TJ, the respondent mother disagreed with the doctors who said that her child needed this particular anti-seizure medication. They tried a number of different regimens. They tried the keto diet. The mother did not like any of them or the side effects that they had for her child, and so her solution, at the time of the filing of the petition, pardon me, was to provide no medication to her child because she did not feel it was appropriate or necessary. By contrast here, the respondent mother has no quarrel at all with her daughter receiving the medications. It was just an issue of her actually receiving them, and so to your Honor's point, expert medical testimony, while always would add more depth and flavor to the evidence that was presented, would not be necessary here for a reasonably educated layperson, as Justice Van Tine referred to in her dissent in TJ, would be able to puzzle out, I suppose, for themselves. There was, the State, prior to the hearing, gave a list of witnesses that was going to testify at the hearing and included in that list of witnesses the two doctors, right? Are you referring to the case management conference? Yes. Basically, so the judge can kind of plot out how long this hearing is going to take, and in that listed those two doctors, right? Yes. So it seemed to say, at least at some point, the government thought that it would benefit and it would be necessary to have these doctors testify. Well, the case management order, in my experience at least, because Moore refers to potential witnesses, lays out for almost discoverable and disclosure purposes to all parties who may be called to testify what does the entire picture look like, and then when it comes to the witnesses they call at trial, they may veer off of that, of course, as any party may. And they're not, I don't believe that the case management conference order is any sort of binding document or we promise we're going to call these witnesses. However, yes, those two doctors were listed on the case management conference order as potential witnesses. And I don't think there's any, right, there's no requirement that those witnesses be called, but that would seem to say that the state, at least at that point, was thinking these are witnesses that would be necessary to explain this mitral valve diagnosis or mitral valve condition that requires anoxicrine or whatever medicine it is that is required, right? I agree. What is in dispute in this case with respect to the neglect findings and Z.A. is whether Z.A. received those two necessary medications consistently and on the schedule that her doctors indicated. The evidence established that she did not. Respondent mother's failure to ensure that her child received the necessary blood thinner injections and timely received her penicillin injections every 28 days, constituted neglect. For all these reasons, as well as those in the people's brief, we ask this court to affirm the findings. Can I ask you one more question? Yes. What is your position on the public guardian and the public defender's argument that the court could consider the finding of a no-fault dependency as an alternative, that this court could consider it? Sorry, what's the state's position? The people's position, Your Honor, is that some finding is better than no finding, that the evidence supports the findings that were entered by the juvenile court and they were not against the manifest weight of the evidence, but that if this court saw that it was appropriate to enter a no-fault dependency finding, of course we would not quarrel with that. Okay, thank you. Is that what you're looking for? Yeah, yeah. Good morning, Justices, and may it please the Court. I'm Assistant Public Guardian Jessica Larson, here today on behalf of the child in this case, who I will refer to, as others have, as Z or Z.A. I'll be joining with the State in arguing that the child court's findings of adjudication and disposition that Z was neglected and Ms. A was unable to care for her were not against the manifest weight of the evidence and should be affirmed. Counsel for the mother argues that Inmate T.J. is dispositive in this case. As this court knows, Z's case, like all child abuse and neglect cases, is sui generis and it must be considered based on its own unique facts. And it's those unique facts that distinguish this case from T.J. for three primary reasons. The first reason is that this case is less complex than T.J. In this case, the minor has one medical condition and two longstanding treatments. Z received her heart valve replacement in the fall of 2019 when she was 10 years old and began receiving daily blood thinners and monthly penicillin injections at that time. By the time the investigation that led to this case opened up, Z was now 15 and she had been taking the daily blood thinners and the monthly penicillin injections for over five years. The child in T.J. had multiple conditions and numerous medications, and the court took issue with the fact that there wasn't specific testimony about which condition and which medication was at issue. The second reason is that the necessary care for Z is not in dispute. The parties agree what care was necessary. The factual dispute is whether she was receiving it. Ms. A does not dispute, and in fact her attorney argued in closing a trial, that Z needs her daily blood thinners and her monthly penicillin injections or else she's at risk of potentially severe medical consequences. The third reason is that in this case there was no CAHPS report and no child abuse pediatrician involved. The medical records in this case were used for purposes that are specifically outlined in the statute as acceptable. Medical records here were not used as a substitute for expert testimony. They were used as proof of Z.A.'s condition, the appointments that she missed, and whether her medications were being picked up on time. These fall under the areas of condition, act, transactions, occurrences, events. These are all specifically outlined in the Juvenile Court Act in Section 2-18 as acceptable uses for medical records. And that also comports with INRI T.J. and INRI Z.I., the case that Your Honors allowed me to cite to you today. But didn't the caseworker talk about some of the... She talked about her conversations with the doctors. So she's essentially presenting the medical testimony through the lay witness. That's correct, Your Honor. The information came from two sources here, both the testimony of the caseworker and through the medical records. But it's not the caseworker's personal knowledge or any of her personal observations in most of it. It's her way of laying conversations or information that she may have received from the different providers, right? That's correct, Your Honor. And if, from tracking the mother's argument, the whole premise of it is that this is medically necessary treatment, and if we're going to say it's medically necessary treatment, a doctor or an expert should testify to say that this is medically necessary. Your Honor, T.J. doesn't set out a bright-line rule in either direction, either that expert testimony is always required or never required. And I'll note the Juvenile Court Act does not require expert testimony in all cases of medical neglect. And I think that the important distinction here is that the necessary care was not being disputed. So Ms. A never disputed that she had the heart condition, that she was prescribed the blood thinners and the penicillin injections, and that they were necessary for her well-being. The T.J. Court took issue in part, I apologize, with the lack of expert witness testimony as to that child's diagnosis, the treatments that were prescribed, and the potential consequences of not receiving those treatments. But we have all of those pieces here. No party is disputing any of those facts in this case. So for that reason, an expert was not required to testify to that information because it was not being disputed. Are you saying it was not disputed because it just was acknowledged, or it wasn't disputed because the records were admitted without objection? I think both, Your Honor. It wasn't disputed because all of the parties acknowledged the condition, the treatments, and the necessity of those treatments, and it was also contained in the medical records. However, I think it's important, the significant piece is that none of the parties disputed any of those facts in this case. T.J. was the opposite. In that case, we know that the child was not receiving the medication prescribed. What was in dispute was the mother disagreeing with the necessity of that treatment. So if T.J. states that a medical expert was necessary to testify to that piece, then it follows that an expert is not necessary here where we have that piece established and no party is disputing those facts. The factual dispute in this case is down to whether Z was receiving her prescribed treatments or not. And in that instance, testimony from a cardiologist, a hematologist, or another doctor would not be helpful. Those doctors were not in the home with Z and Ms. A. They aren't observing whether or not she's administering her treatment every single day. They don't have additional insight into those particular facts. But wouldn't they know, possibly based on her appointments or her test results or any sort of other objective indicators, whether she's taking it or not? What the doctors knew was that the prescriptions weren't being picked up on time as they would be if they had been being taken as prescribed, and that information is contained in the medical records. The other evidence of whether Z was taking her medication or not comes from the testimony of Mr. Sandoval-Garcia and what he observed in the home, which was that when he went to the home, he saw six boxes of medication that had a pickup date of September of 2024. They were numbered one through six out of six, and each contained ten injections. So we know that that's 60 total injections and that Z took two per day. So that's a 30-day supply. That medication also comes from the medical records where, from the prescribing information, we know that 36 milliliters of the medication was dispensed at a time, and I won't go into the math right here, but based on the dosage that Z took, we know that 36 milliliters is a 30-day supply of medication. Ms. A, in her reply brief, claims that Z was running low on medication when DCFS investigators came to the home. That's not correct, and that actually would have been better. The issue is that in January of 2025, when Mr. Sandoval-Garcia visited the home for the first time, he observed an almost full supply of medication that had been picked up in September of 2024 and should have been gone by October of 2024 if it were being taken as prescribed. Ms. A, also in her brief, admits that the medication was picked up in September of 2024 and then not again until January of 2025, the week before the temporary custody hearing. We know that, from Mr. Sandoval-Garcia's testimony, the doctors prescribed four to six months of medication at a time. However, we also know from Mr. Sandoval-Garcia's testimony that it was his understanding that it was not distributed four to six months at a time, but rather it was prescribed for that long with refills. But that's a caseworker giving away opinion about how a medical professional prescribes medication or refills it or how that works. Isn't the expert opinion noted for that type of testimony? No, Your Honor, because first, that testimony was not disputed. No contrary evidence was presented to contradict that testimony from Mr. Sandoval-Garcia. And in addition, he was testifying to his understanding of what was prescribed and how it was distributed based on his conversation with Ms. A and Z. So that is how they understood that information as well. So I don't believe that a medical expert would be required to testify to that information either, since, again, Mr. Sandoval-Garcia is speaking to the understanding that he obtained directly from Ms. A and Z. Even if Z were responsible for giving herself these injections, it's important to note she's only 15 years old at this time. She's not an adult, and an adult is still required to refill her medications, to go to the pharmacy and pick them up, and to take her to her doctor's appointments. On the subject of doctor's appointments, the evidence showed that Z missed an antibiotic injection appointment in January of 2025, and that that appointment was only made up weeks later after repeated interventions by DCFS and the doctors. We also know that there's no evidence that Z attended her antibiotic injection appointments in July, October, or November of 2024. We also know that Ms. A refused to participate in intact services or even speak with the intact service worker, and was frequently combative with the assigned caseworkers and doctors when they tried to speak to her about these issues with Z's medication and appointments. In terms of, you're talking about these appointments in July, October, or November. These are the penicillin injections, but the state doesn't talk about this in terms of the records that they're citing to, or pages they're citing to. This isn't discussed at the hearing, right? I don't believe it is, Your Honor. These are part of the 4,000 pages of records that were admitted, and this is what we're talking about here. That's correct, Your Honor. However, I'll note that based on the standard of review in these cases, this Court reviews for whether there's any evidence contained anywhere in the record that supports the findings that the trial court made. It's not required that the trial court have cited to those specific facts in making its ruling at the trial level. For this Court to refer based on those facts being present in the record. So the fact that somewhere within the 4,000 pages is a basis that can be found is enough for us to say there is evidence. Yes, Your Honor. That's the case law. That's the state of the law in Illinois at this time. Ms. A cites to Henry E.G. in her brief and her reply brief. This case is inapplicable to the present case. Henry E.G. was a case that involved a neglect finding against a parent being reversed after the child in that case was found to be a mature minor in the legal sense, given that it conscientiously rejected her own medical care. A mature minor finding is a specific factual finding that needs to be made at the trial court level by clear and convincing evidence, and it was not even discussed at the trial level here. In addition, there is nothing in E.G. that suggests that the finding of neglect against that parent would have been reversed, absent the mature minor finding that was made in that case. Further, there's also no evidence in this case that Z was ever conscientiously rejecting her medication. All the parties, again, acknowledge that Z needed this medication, and there's no evidence that she was ever unwilling to take it. The dispositional findings in this case that Ms. A was unable to care for Z were also supported by the manifest weight of the evidence. And the counsel's not challenging the dispositional order. Correct, Jonah. And should the court reach the dispositional order, that order was also supported by the manifest weight of the evidence and was in Z's best interest. Quick comment. So in your brief on page 20 in the footnote, and I know you found the status report, you are advising the court that now information has changed and now the minor wants the goal changed to return home. So you acknowledge that we really can't consider that because it's outside the record that was in front of the trial judge at the time, right? That's correct, Jonah, yes. Okay. And so then what's the point of providing that information? As Z's attorney, it's, I believe, part of my obligation to present to the court what Z's position is at this time. Although your honor is correct, it was not in the record in front of the judge at the trial level and also under Emory DF that matter of Z's return home or expanded visitation or what her current wishes are are properly still before the trial court. The trial court has that jurisdiction and is continuing to address that issue. However, we wanted to make sure that the court was apprised of Z's position because it had changed. The standard of review in this case is whether the trial court's findings were against the manifest weight of the evidence. In this case, the evidence showed that there was no dispute as to what Z's necessary care was. The dispute was whether she was receiving that care, and the evidence showed that she was not. For those reasons, the adjudication and disposition orders of June 23, 2025 are not against the manifest weight of the evidence and should be affirmed. Thank you. Thank you, counsel. Your turn, your turn. Okay, thank you, Your Honor. I'm going to follow the rules. I have five minutes, is that correct? You do. Okay, thank you. Okay, so Your Honors, first I'm going to piggyback on the public guardian's reference to the evidence. What I don't think anybody has referenced with respect to if we are one of the considerations in this case is the evidence presented. So Mr. Sandoval Garcia's testimony as a child protection investigator, his testimony, among other things, was that the minor represented to him that she took the daily medication. And so, too, was the public guardian's reference during the closing in this case, where the public guardian representing the minor's wishes indicates, as her attorney, she wants to make it clear to the court that there was no instruction and to what order she had to take the medication. To me, that also seems something that the TJ Court was concerned with, that is the necessity of expert testimony to interpret what the precise medication for the precise condition would have been. But also, the public guardian represented during closing that it wasn't her mother's fault, that is, this is what the public guardian represented that the minor wanted the public guardian to represent to the court, that the doctor gave him a lot of medication at once, Your Honor. She also stated that she did take her medication every day. Your Honor, it also stated that they only missed one appointment in January 2025. Your Honor, as the GAO, Your Honor, this contradicts some of the information, what is like 1,200 pages of medical records from the University of Illinois at Chicago, Your Honor. So it puts me in a position where I have to look at, you know, medical records and the opinions of professionals. So, Your Honors, that is, I believe, what TJ represented. There was no reference to the trial court of the particularized pages being relied on by the state for the medical neglect theory and case, to support their case, only just dumping to the trial court of over 4,000 pages of the entirety of the minor's medical history. And this is a concern that Henry TJ stated, and I repeat because I believe I stated this in my introduction, that as a result of an appeal without any assistance from trial testimony, lawyers for the state and the GAO were left to rifle through the medical records in search of evidence after the fact to justify the trial court's neglect findings. With the record in this condition, both Mother and this court were left to wait until the state's and the GAO's response briefs on appeal to learn what evidence supported the trial court's ruling. Your Honor, when the state began its argument, the state represented to the court that there were only 250 relevant pages of the medical records. Now, that was not represented to the trial court, as Your Honor, Justice Navarro pointed out. So the concern in TJ about bringing to the court's attention the relevant pages did not occur here with or without an expert testimony. Okay, so that concern in Henry TJ is also in this case. And also, on what schedule that the minor was required to take this alleged life-sustaining medication and the ramifications of non-treatment. That was also not represented by an expert. It might have been in the medical records. But, as I stated, this adjudication hearing occurred within about half of a day, when I say at least part of a day, because the adjudication and the disposition took place on the same day. So there was not much time, really, to discern. But that was in disputed by the mom. She acknowledged in her testimony that she understood that the minor needs... My mom didn't testify, Your Honor. She testified. I mean, there's two statements from her in the record that she understood that the minor needed to take that medication. That she picked it up. Well, her statement is made through Mr. Sandoval-Garcia as well. To the case workers. Case workers. But exactly what medication? Just that my understanding of Mr. Sandoval-Garcia's testimony about my client's admissions were that she might have acknowledged the importance of taking the daily medication. And that I don't know that there was any testimony by Mr. Sandoval-Garcia about the insulin shots, which we haven't really discussed. But really, I mean, I think the state's position and the guardian's position is any basis, any one thing is enough to find neglect, right? So whether it's the monthly injections, which really there wasn't any testimony about, or the daily injections, daily medicine. Okay, I'm going to disagree, Your Honor, because based on TJ, with that expert testimony, we really don't know. I think that's the point. That we really don't know. And I think that was the point of TJ. Again, TJ began the opinion, this court began the opinion by indicating that this is sad that we have to do this. This is my interpretation, because we're now making a comment about the colorability of the state's claim. Only that it wasn't proven because of the medical records, what needed to be proved, and the absence of the correct expert testifying. So my response to Your Honor is that we really don't know, and that's why we need a remand and an expert to testify. And also, yes, the best interest of the child is paramount in these cases, I understand. But I also want to represent to the court on behalf of my client that the mother has an interest in preserving the family relationship, which was broken in this case, because of the trial court's ruling. Okay, Your Honor, thank you for your time. Thank you, Counsel. All right, we're going to take this matter, and thank you for your arguments, we'll take this matter under advisement and issue an opinion in due course. There's just, so that's this case. It looks as I look out into the gallery, I've actually got a pretty full house, kind of unusual for this, for the court, which is really nice. And without making any assumptions, it looks like I see a lot of, let's see, youthful faces out here. Not making any statements about the lawyers here. Youthful faces, they'll say. Younger faces. And so, maybe these are students in school, or externs, interns, law students. We're going to take a brief recess, and then if you'd like to stick around, we'd be happy to answer some questions, not about the case, but about the court in general. So we'll take a brief recess.